UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | **2:21-CR-20715-TGB-DRG-1** |
| Plaintiff, | HON. TERRENCE G. BERG |
| v. | **ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS (ECF NO. 31)** |
| **STEVEN J. VINING JR.**, | |
| Defendant. | |

Defendant Steven Vining Jr. moves to suppress evidence seized by Michigan State Police ("MSP") troopers and Federal Bureau of Investigation ("FBI") agents at the Greyhound Bus Station in Detroit, Michigan on September 28, 2021. Defendant's Motion to Suppress, ECF No. 31, PageID.121. A federal grand jury returned an indictment charging Defendant with various drug offenses.[1] Defendant makes several arguments in support of his motion to suppress: (1) that the officers had no reasonable suspicion to temporarily detain him; (2) that the officers lacked probable cause to arrest him; and (3) that the warrantless search of his bag violated the Fourth Amendment. He

---

[1] Defendant is charged with three counts in the Indictment: (1) Conspiracy to Possess with Intent to Distribute and to Distribute Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846; (2) Possession with Intent to Distribute Methamphetamine in violation of 21 U.S.C. § 841(a)(1); and (3) Possession with Intent to Distribute Fentanyl in violation of 21 U.S.C. § 841(a)(1). Grand Jury Indictment, ECF No. 12, PageID.31–34.

1

therefore contends that the drugs found in his bag and the statements he made during his custodial interrogation should be excluded as fruits of an unlawful search and seizure. *Id.* at PageID.125. For the reasons that follow, Defendant's motion to suppress evidence is **GRANTED**.

## I. BACKGROUND

At approximately 12:55 p.m. on September 18, 2021, Defendant arrived at the Greyhound Bus Station ("the Station") in Detroit, Michigan carrying a bag. ECF No. 31, PageID.120. Defendant was first spotted by FBI Detective Matthew Kiser, a member of a team of MSP and FBI officers working a drug interdiction operation, who was stationed in a covert location near the front entrance of the Station. Dec. 20, 2022 Hearing Transcript, ECF No. 36, PageID.164, PageID.169. Kiser saw Defendant, a Black man wearing a yellow construction vest, hurrying into the Station after he exited a vehicle that pulled up to the front door. *Id.* at PageID.169. Kiser communicated his observations and a description of Defendant to officers inside the Station. *Id.* at PageID.170. From inside the Station, FBI Special Agent Bradley Cioma observed Defendant as he "quickly walked into the bus station carrying a bag and looked around." Cioma Affidavit, ECF No. 1, PageID.3.

According to Cioma, Defendant's "last-minute arrival" increased the officers' suspicion, "as this is a common tactic used by narcotics traffickers to limit their time to be observed by law enforcement." *Id.* Consistent with security video footage presented at the evidentiary

hearing, Cioma testified that after Defendant entered the Station, he witnessed Defendant approach the front window of the building and knock on the glass, attempting to attract the attention of someone outside. ECF No. 36, PageID.191. Cioma communicated this observation to the other officers who had been watching Defendant since Kiser first reported his late arrival. *Id.* at PageID.192.

Based on these observations, two officers approached Defendant, who then allegedly set his bag down "near the exit door from the interior of the bus station . . . and said he was going to go get a ticket." ECF No. 1, PageID.3–4. The officers attempted to talk to Defendant as he walked to the ticket counter, but Defendant "kept repeating the same question and was looking all around the bus station." *Id.* at PageID.4. Defendant did not respond to the officers' questions as to why he left his bag by the door and why he needed a ticket when the officers could see he already had one in his hand. *Id.* According to the officers, Defendant appeared nervous and evasive, behavior they found "consistent with subjects who are attempting to traffic narcotics when they come in contact with law enforcement." *Id.*

At that point the officers made the decision to "detain" Defendant by placing him in handcuffs and asked him whether he had any illegal narcotics in his bag. ECF No. 1, PageID.4. Defendant responded that he had "approximately 5 pounds of Marijuana." *Id.* The officers then moved Defendant to a nonpublic area of the Station used by police officers for

3

surveillance, interrogations, searches, and detention of suspects and arrestees. ECF No. 36, PageID.183, PageID.195–97.

After Defendant was handcuffed and moved to the nonpublic area, MSP Trooper Ben Sonstrom retrieved a narcotics canine stationed at the scene to conduct a sniff of the bag. *Id.* at PageID.216. The dog positively alerted to the presence of narcotics. *Id.* at PageID.216–17. Sonstrom proceeded to search Defendant's bag and found a total of 2,156 grams of methamphetamine and 285 grams of fentanyl. *Id.* at PageID.225–26; ECF No. 1, PageID.5.

Following the search, Defendant was arrested and transported to the MSP Detroit Detachment. There, he was read his *Miranda* rights and interrogated. ECF No. 1, PageID.11. During this interrogation, Defendant "admitted to transporting illegal substances in exchange for clearance of $25,000 in gambling debt for a family member." *Id.* at PageID.11–12. Defendant further stated that he intended to transport the drugs to Columbus, Ohio, despite being restricted from traveling outside of Michigan by his probation for a weapons offense. *Id.* at PageID.12. Defendant also disclosed that he had "a prior felony drug case out of state" and acknowledged that "it was wrong to try to traffic illegal substances." *Id.*

Defendant contends that the officers unlawfully stopped him and searched his bag. As such, Defendant moves to suppress evidence of the drugs obtained from the officers' search and the statements made during

4

the subsequent custodial interrogation as fruits of an unconstitutional search and seizure.

The Court held an evidentiary hearing on Defendant's motion to suppress on December 20, 2022. At the hearing, the Government presented testimony from three officers involved in detaining Defendant and searching his bag: FBI Detective Matthew Kiser, FBI Special Agent Bradley Cioma, and MSP Trooper Ben Sonstrom. While the officers provided detailed accounts of their interdiction operation and interactions with Defendant, neither party meaningfully addressed whether Defendant's initial detention escalated into an arrest requiring probable cause or the legality of the warrantless search of Defendant's bag. Accordingly, the Court ordered the parties to submit supplemental briefing on these two issues. The parties completed supplemental briefing on February 17, 2023.

## II. LEGAL STANDARD

The Fourth Amendment protects individuals and their belongings from "unreasonable searches and seizures." U.S. Const. amend. IV. "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). Furthermore, "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business,'" such an encounter is

considered "consensual" and does not require any reasonable suspicion. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)).

But when officers engage in nonconsensual conduct that "stop[s] short of something called a 'technical arrest' or 'full-blown search,'"—that is, when they conduct what is commonly called a "stop-and-frisk"—they may only do so if they can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry v. Ohio*, 392 U.S. 1, 18, 20–21 (1968). While an "inchoate and unparticularized suspicion or 'hunch'" will not suffice, an officer may draw reasonable inferences "from the facts in light of his experience" to demonstrate the reasonableness of a stop. *Id.* at 27. A court must also assess the "whole picture" to determine whether "the detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). Indeed, even "innocent conduct" viewed in the totality of circumstances can generate reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

In moving for suppression of evidence, the defendant bears "the burdens of production and persuasion." *United States v. Chaar*, 137 F.3d 359, 363 (6th Cir. 1998). Specifically, the defendant must demonstrate that the Government violated his constitutional rights in conducting a search or seizure. *See United States v. Rodriguez–Suazo*, 346 F.3d 637,

643 (6th Cir. 2003). But ultimately, the Government bears the burden to show by a preponderance of the evidence that its search or seizure was reasonable. *See United States v. Winters*, 782 F.3d 289, 295 (6th Cir. 2015); *United States v. Baldwin*, 114 F. App'x 675, 681 (6th Cir. 2004); *United States v. Matlock*, 415 U.S. 164, 177, 177 n.14 (1974).

## III. DISCUSSION

### A. Whether Defendant Was Seized by the Officers

As a threshold matter, the Court must resolve whether Defendant was subject to a seizure triggering Fourth Amendment protections. The Government contends that when the officers first approached Defendant at the Station, they initiated a "consensual encounter," meaning that the officers did not need any level of suspicion because Defendant was not seized at all. Government's Response in Opposition to Defendant's Motion to Suppress, ECF No. 33, PageID.144. Defendant argues that this initial interaction must be supported by reasonable suspicion because it constituted a *Terry* stop. ECF No. 31, PageID.127–28. Defendant further contends that the *Terry* stop escalated into a warrantless arrest without probable cause. Defendant's Supplemental Briefing, ECF No. 39, PageID.276.

As explained in greater detail below, the Court concludes that the initial encounter in which the officers approached Defendant to ask him questions before he could board the bus was not a *Terry* stop. Furthermore, when Defendant was detained, the totality of the facts and

7

circumstances known to the officers provided them with reasonable suspicion justifying a *Terry* stop. But in handcuffing Defendant and moving him to a nonpublic area of the Station, the officers exceeded the permissible scope of a *Terry* stop and placed Defendant under arrest, which required them to have probable cause.

### 1. Whether the Initial Interaction with Defendant Was a Consensual Encounter

As Defendant acknowledges, the Fourth Amendment does not prohibit police officers from engaging in consensual encounters with individuals in public spaces. ECF No. 31, PageID.132. Even so, Defendant assumes that the officers' initial interaction with him constituted a *Terry* stop rather than a consensual encounter. To be considered a "stop," which is a form of "seizure," the police must use their authority to constrain a person's ability to leave. *United States v. Mendenhall*, 446 U.S. 544, 553 (1980) ("[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained."). Such temporary seizures require reasonable suspicion of criminal activity. *Terry*, 392 U.S. at 20–21.

But a consensual encounter is a police-citizen contact that falls short of a "stop," where a police officer may interact with a person and ask questions. *Drayton*, 536 U.S. at 200. Police actions like this do not require reasonable suspicion. *Id.*; *see also Mendenhall*, 446 U.S. at 554. Specifically, the Supreme Court has held that "even when officers have

no basis for suspecting a particular individual, they may generally ask questions of that individual" without implicating Fourth Amendment protections. *Bostick*, 501 U.S. at 434–35.

Determining whether a particular encounter is a consensual encounter or a "stop" requires looking at "all of the circumstances surrounding the incident" and asking whether "a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. Key factors in this inquiry include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* Similarly, "the setting in which the conduct occurs" may also affect whether a reasonable person would feel free to disregard the police. *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

The circumstances of this case closely parallel those at issue in *United States v. Peters*, 194 F.3d 692 (6th Cir. 1999). In *Peters*, federal agents at an Amtrak station first observed the defendant disembarking a train while carrying a bag. *Id.* at 694. The agents watched the defendant enter the station to use a payphone, where the "defendant looked around the train station as if he were conducting countersurveillance." *Id.* After the defendant carried and stowed his bag onto a bus heading to Detroit, the agents approached him and asked to see his ticket. *Id.* The agents found that the defendant was traveling

9

under an assumed name, and the defendant "became nervous, bowed his head, and mumbled" when the agents asked for explanation. *Id.* The agents also inquired "about his destination and purpose for travel," and whether "he had any luggage." *Id.* at 694–95.

When the defendant falsely denied owning the bag, the agents escorted the defendant off the bus, conducted a canine sniff test, searched the bag, and found 400 grams of heroin. *Id.* at 695. In moving to suppress the heroin, the defendant argued that "the special agents' initial encounter and subsequent conversations with him were not consensual," and he "did not feel free to go." *Id.* at 697–98. The Sixth Circuit held that the defendant was not seized where police officers approached him and "simply asked to see his bus ticket, train ticket, or other identification, whether he had any luggage, and his purpose for travel." *Id.* at 698. Because the defendant did not present any evidence of "coercive activity on the part of the special agents up to the point when they asked if the suitcase belonged to him, the stop remained a consensual encounter, which does not require reasonable suspicion for Fourth Amendment purposes." *Id.*

The facts in this case are similar. Defendant points to no evidence of coercive tactics being employed during the initial encounter to support finding that he was seized. From the security video footage submitted by Defendant, it appears that Defendant was initially engaged by two officers, and one to two other officers may have interacted with him

10

shortly after the initial approach. The officers did not display their weapons, physically handle Defendant, or otherwise compel him to submit to questioning. As in *Peters*, the officers initially questioned Defendant in a public setting about his travel plans, unattended baggage, and inconsistencies in his explanation for needing to buy a second ticket. The totality of the circumstances suggests that the officers' first encounter with Defendant was a consensual police-citizen contact for questioning; it did not require reasonable suspicion. Therefore, Defendant has not established a Fourth Amendment violation stemming from this initial interaction.

### 2. Whether the Officers Had Reasonable Suspicion to Detain Defendant Before Searching His Bag

Although the initial interaction between Defendant and the officers was a consensual encounter requiring no level of suspicion, their encounter quickly developed into a temporary detention. *See* ECF No. 33, PageID.143. Once the officers detained Defendant, the encounter escalated from a consensual encounter to an investigatory stop, requiring the officers to have reasonable suspicion of criminal activity. In other words, once Defendant's ability to terminate the interaction was restricted, the officers must have had reasonable suspicion to seize him.

To evaluate whether reasonable suspicion exists, the Court must assess the totality of the circumstances. *Cortez*, 449 U.S. at 417. Establishing reasonable suspicion is "less demanding" than showing

11

probable cause and requires "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Evidence of suspicious behavior, furtive movements, nervousness, and evasiveness placed in context of an officer's experience can yield reasonable suspicion warranting a *Terry* stop. *See Terry*, 392 U.S. at 23–24; *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Moreover, "[i]n considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot." *United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005).

Here, Defendant contests whether the officers had reasonable suspicion to temporarily detain him. Defendant further contends that the Court should afford the Government "minimal" deference because "there is no evidence [that the officers] ever worried about their safety" when stopping Defendant. ECF No. 31, PageID.135.

The Court is unpersuaded that it should give limited deference to the Government based on lack of safety concerns. First, Defendant ignores the weight of Supreme Court and Sixth Circuit precedent emphasizing the need to view reasonable suspicion through the lens of an officer's experience and training. *See, e.g.*, *Terry*, 392 U.S. at 30; *Arvizu*, 534 U.S. at 273; *United States v. Torres-Ramos*, 536 F.3d 542, 552 (6th Cir. 2008). This includes assessing "the modes or patterns of

12

operation of certain kinds of lawbreakers . . . that might well elude an untrained person." *Cortez*, 449 U.S. at 418.

Second, and more fundamentally, Defendant conflates the armed-and-dangerous rationale behind permitting *Terry* frisks with the reasonable suspicion standard that applies to a *Terry* stop. Of course, as Defendant recognizes, officers may develop reasonable suspicion of criminal activity based on their observations that a person is likely armed and dangerous. ECF No. 31, PageID.33–34. Indeed, such was the case in *Terry*, where the officers' reasonable suspicion permitted them to stop the defendant *and* conduct a frisk for weapons. *See Terry*, 392 U.S. at 30. And importantly, a *Terry* frisk requires "particular facts from which [the officer] reasonably inferred that the individual was armed and dangerous." *Sibron v. New York*, 392 U.S. 40, 64 (1968).

But *Terry*'s requirement that a *frisk* be conducted only if officers have reasonable suspicion that the person stopped is armed and dangerous does not apply to a *Terry stop*. As the Supreme Court made clear in *Arizona v. Johnson*, a *Terry* stop is permissible "when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense." 555 U.S. 323, 326 (2009). To initiate a *Terry* stop, there is no specific requirement that the officer fears for his safety or suspects the person of being involved in violent crime. In fact, in *Johnson*, the Court held that "in a traffic-stop setting, . . . it is lawful for police to detain an automobile and its occupants pending inquiry into

a vehicular violation." *Id.* at 327. But "to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Id.* at 326–27. Therefore, if the officers had reasonable suspicion that Defendant was engaged in any criminal activity—such as drug trafficking—*Terry* allows for a brief detention to investigate the suspected crime regardless of whether the officers believed Defendant was armed and dangerous.

So, here, what were the facts the officers had that might create reasonable suspicion to briefly detain Defendant after the initial consensual encounter? From the start of their encounter, the officers rely on their observations of Defendant's late arrival, his gestures at an unknown person outside the station, and his carrying of a bag. These facts describe the conduct of many travelers and do not give rise to any reasonable suspicion of criminal activity.

But after briefly engaging with Defendant, the officers gathered additional information. First, Defendant put his bag down and walked away from it—somewhat unusual behavior in a public bus station that suggested a desire to put distance between himself and the luggage. Second, the officers observed what they thought was excessive nervousness in the way that Defendant evaded answering their questions. Third, Defendant made the seemingly nonsensical statement that he needed to obtain a bus ticket when the officers saw Defendant holding a ticket in his hand. Based on their experience with drug

14

trafficking investigations, the officers reasonably concluded that Defendant's nervousness, evasive answers, and attempt to distance himself from his bag were the kinds of suspicious behavior that merited further investigation for potential criminal activity.

As the Supreme Court pointed out in *Sokolow*, "[a]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion." 490 U.S. at 9. Similarly, in this case, the available facts combined with the officers' experience and knowledge gave them reasonable suspicion justifying a brief *Terry* stop or temporary detention of Defendant.

### 3. Whether the *Terry* Stop Escalated to an Arrest Without Probable Cause

In his supplemental briefing, Defendant argues that even if the officers had reasonable suspicion to conduct a *Terry* stop, the detention "quickly, if not almost immediately, rose to a formal arrest." ECF No. 39, PageID.276. The Government contends that the officers had probable cause to arrest Defendant because he made a statement to them that he was carrying five pounds of marijuana before he was escorted to the non-public area. Government's Supplemental Reply, ECF No. 40, PageID.282. While the scope of the *Terry* stop did not present obvious concerns based on the parties' initial briefing and surveillance footage, the officers'

evidentiary hearing testimony shed light on the chain of events that led to what the Government calls Defendant's "detention."

Although officers with reasonable suspicion may conduct a *Terry* stop, they cannot "exceed the limits of an investigative detention." *Florida v. Royer*, 460 U.S. 491, 502 (1983). A *Terry* stop must cause "minimal intrusion, simply allowing the officer to briefly investigate further." *Wardlow*, 528 U.S. at 126. Therefore, a *Terry* stop is reasonable only if it is "sufficiently limited in time" and "the investigative means used [were] the least intrusive means reasonably available" to dispel or confirm the officer's suspicions. *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 825–26 (6th Cir. 2005)).

In *Florida v. Royer*, the Supreme Court held that officers who stopped the defendant at an airport exceeded the scope of a permissible *Terry* stop by retaining his flight ticket and driver's license, removing his checked luggage from the aircraft without his consent, and moving him to a nonpublic "police room" for further questioning. 460 U.S. at 503–04. The Court acknowledged that the officers had reasonable suspicion at the time they turned the public consensual encounter into a *Terry* stop, but nonetheless concluded that they improperly escalated the stop to "an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions." *Id.* at 503.

16

Moreover, the Court highlighted that "reasons of safety and security [could] justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area." *Id.* at 504–05. But the officers did not demonstrate that "legitimate law enforcement purposes" permitted them to move the defendant to the police room. *Id.* at 505. Instead, the Court found that "the primary interest of the officers was not in having an extended conversation with [the defendant] but in the contents of his luggage, a matter which the officers did not pursue orally with [the defendant] until after the encounter was relocated to the police room." *Id.*

Here, the testimony by the officers during the evidentiary hearing raised questions about when Defendant was subjected to a full custodial arrest after the initial *Terry* stop, and whether such an arrest was supported by probable cause. After recounting the officers' initial consensual encounter with Defendant and the officers' growing suspicions that he was involved in criminal activity, Agent Cioma agreed that the officers made "a decision . . . to detain" Defendant. ECF No. 36, PageID.195. When asked to describe "the nature of that detention," Cioma answered that Defendant "was handcuffed." *Id.* Additionally, Defendant was separated from his bag, which was retrieved and moved by the officers at some point shortly after he was handcuffed. ECF No. 36, PageID.224–25.

The use of handcuffs does not necessarily exceed the bounds of a *Terry* stop. But handcuffs are appropriate only where "the circumstances warrant that precaution." *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999). Here, there was no evidence presented suggesting a risk of flight or danger that would explain why handcuffing Defendant was necessary. When asked why he handcuffed Defendant, Trooper Sonstrom testified that the purpose of handcuffing was "[t]o detain" Defendant because the officers "believed that crime was afoot." ECF No. 36, PageID.215. The officers did not testify that handcuffing was necessary for officer safety or some other valid purpose related to the scope of a temporary investigative detention. In the absence of such facts justifying the use of handcuffs during a *Terry* stop, Defendant argues that the officers effectively placed him under arrest based only on reasonable suspicion, when an arrest must be supported by probable cause.

Even assuming that handcuffing was reasonable as part of a temporary detention, moving Defendant to a nonpublic area for further interrogation certainly exceeded the bounds of a *Terry* stop and required probable cause under *Royer*. Cioma testified that "[a]fter [Defendant] was detained, he was moved back to the nonpublic area" used by police for surveillance, interrogations, searches, and detention of suspects and arrestees. *Id.* at PageID.183, PageID.188, PageID.196–97. Moreover, when asked directly why the officers moved Defendant to the nonpublic

18

area, Cioma responded, "[j]ust to get [Defendant] out of the public area." ECF No. 36, PageID.197.

An exercise of seizing authority such as moving Defendant to a nonpublic area, must be supported by a valid purpose in the same way that handcuffing must be justified in the context of a temporary detention based on merely reasonable suspicion. The police conduct here escalated from a voluntary interview, to a brief stop, to a situation where Defendant was handcuffed, separated from his luggage, and plainly not free to leave. When Defendant was moved to the nonpublic area without valid justification, "the detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity." *Royer*, 460 U.S. at 502.

In response, the Government claims that the officers had probable cause for Defendant's arrest because he admitted to possessing five pounds of marijuana. ECF No. 40, PageID.282. Although Cioma did not address the question of when Defendant made the statement about the marijuana during his evidentiary hearing testimony, his affidavit, filed in support of the criminal complaint, states as follows:

> Detectives then detained VINING JR., due to him leaving his bag behind and his overall nervous behavior which is consistent with subjects who are attempting to traffic narcotics when they come in contact with law enforcement. VINING JR. was identified and was asked if he had any illegal narcotics inside his bag and he advised approximately

> 5 pounds of Marijuana. Detectives then took VINING JR. and
> the bag he arrived with to the baggage claim area.

ECF No. 1, PageID.4. Cioma's affidavit then states that Defendant's bag
was subjected to a dog sniff by a trained MSP drug-detecting canine after
he was moved to the nonpublic area. *Id.* At the evidentiary hearing,
Cioma likewise testified that the dog sniff occurred in the nonpublic area.
ECF No. 36, PageID.197.

Accordingly, the Government maintains that Defendant made the
inculpatory statement regarding the marijuana in his bag "prior to . . .
being moved to the non-public section of the bus terminal." ECF No. 37,
PageID.259. Unfortunately, this matter was not clearly established
during the hearing. When asked why the officers moved Defendant to the
nonpublic area, Cioma responded that the purpose was to remove
Defendant from the public, not because Defendant had made inculpatory
statements or took actions that would warrant more significant
detention. ECF No. 36, PageID.197. Furthermore, Sonstrom testified
that he had no recollection of Defendant making the statement regarding
the five pounds of marijuana. *Id.* at PageID.224. Instead, Sonstrom
explained that Defendant was "in handcuffs, [and was] walked to the
back [nonpublic area]" as the officers retrieved his bag "simultaneously."
*Id.* at PageID.225.

To establish probable cause to arrest, the Government bears the
burden to present evidence that the officers had facts supporting the

probability that a crime occurred. *See Illinois v. Gates*, 462 U.S. 213, 239 (1983). The Government cannot rely on the dog sniff to establish probable cause because the sniff occurred after Defendant had been moved to the nonpublic area. But an inculpatory statement, such as Defendant's admission that he was carrying five pounds of marijuana, is sufficient to support probable cause for an arrest. *See United States v. Webster*, 162 F.3d 308, 332 (5th Cir. 1998) ("[The defendant's] admission that he possessed marihuana gave the police probable cause to arrest him."). While such evidence was not presented at the hearing, it is part of the record in the sworn affidavit of Agent Cioma. Defendant was therefore lawfully under arrest shortly before his bag was searched.

### B. Whether the Officers Lawfully Searched Defendant's Bag Without a Warrant

After Trooper Sonstrom's canine alerted positively to Defendant's bag, the agents searched his bag and found approximately 2.1 kilograms of methamphetamine and 285 grams of fentanyl. At the hearing, the Court raised concerns about this search because it was conducted without a search warrant, and the Government had not shown that a valid exception to the search warrant requirement applied. The Court asked for additional briefing on the question, which the parties provided. ECF Nos. 37, 39, 40.

"[A] person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment." *United States v.*

*Place*, 462 U.S. 696, 707 (1983). "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The Government bears the burden to "establish the applicability of an exception to the warrant requirement." *Taylor v. City of Saginaw*, 11 F.4th 483, 487 (6th Cir. 2021).

Here, the Government points to two possible exceptions to the warrant requirement to justify the warrantless search of Defendant's bag. First, the Government contends that Defendant abandoned his bag when he set it down as the officers approached and walked away from the bag toward the ticket counter. Second, the Government maintains that the search was justified under the search-incident-to-arrest exception to the warrant requirement.

### 1. Whether the Abandonment Exception Applies

A person loses their legitimate expectation of privacy in items that they abandon. *United States v. Oswald*, 783 F.2d 663, 666 (6th Cir. 1986). To determine whether an item has been abandoned, the Court must first consider whether Defendant "exhibited a subjective expectation of privacy and, second, whether [his] subjective expectation was justifiable." *United States v. Eden*, 190 F. App'x 416, 421 (6th Cir. 2006). The Court assesses Defendant's subjective intent and whether an objective privacy

expectation exists "based on the totality of circumstances." *United States v. McClendon*, 86 F. App'x 92, 94 (6th Cir. 2004).

Here, the Government relies primarily on the Sixth Circuit's decision in *United States v. Dillard*, 78 F. App'x 505 (6th Cir. 2003), to support its position that Defendant abandoned his bag. In *Dillard*, the defendant "flung" his briefcase about four feet away from him as he saw "five or six officers" approaching the house that he was exiting. *Id.* at 507, 509. The court recognized that "the location of the object in question" was an important factor in determining whether the defendant intended to abandon his briefcase. *Id.* at 510. Because the defendant threw the briefcase "near the side door of a house he had been visiting," the court concluded that he "was not attempting to secrete the container in a place where he had an expectation of privacy, but rather discarded the item in his attempt to avoid arrest." *Id.* at 511.

The Government points to two primary facts to support its abandonment argument. First, Defendant set his bag down and walked away from it after he was initially approached by the officers who prevented him from boarding the bus. ECF No. 37, PageID.253. Second, Defendant did not retrieve the bag or respond to questioning by the officers about why he set his bag down. *Id.* at PageID.256. But the Sixth Circuit has made clear that "a defendant must do more than merely walk away from something as private as a suitcase to support a finding of abandonment." *Eden*, 190 F. App'x at 425; *see also United States v.*

23

*Tolbert*, 692 F.2d 1041, 1044 (6th Cir. 1982) (explaining that the defendant did not subjectively abandon her privacy interest in luggage by "entering a taxicab apparently intent on departing the airport without her luggage").

In other words, "[w]alking away alone does not provide a conclusive indication of [the defendant's] intent or furnish the requisite support for a determination that she maintained no subjective belief that the luggage was secure from police intrusion." *Eden*, 190 F. App'x at 425. Moreover, even where the officers remind the defendant of the bags that they walked away from or the defendant declines an opportunity to collect their bags, the Government still cannot show abandonment on such facts alone. *Id.*

And the facts in *Dillard* are readily distinguishable from those before the Court. In *Dillard* the defendant "flung" his briefcase four feet away from him. Here, Defendant merely set his bag down on the floor before walking toward the ticket counter. While it is undisputable that setting one's bag down in a public transportation hub is ill-advised and creates a risk that either strangers or law enforcement might gain access to it, cases like *Eden* and *Tolbert* confirm that walking away from a bag in similar settings (at an airport, for example) is simply not enough to show intent to abandon. *Cf. United States v. Frazier*, 936 F.2d 262, 265–66 (6th Cir. 1991) (finding that the defendant abandoned his bag at an

airport where he set it down on the floor, walked away from it, and explicitly told officers that it was not his when asked).

Furthermore, Defendant made no statements expressing an intention to abandon his bag or a denial of ownership or possession of the bag. And Defendant's lack of responsiveness to the officers' questions as to why he set the bag down cannot be taken as an expression of a clear intent to abandon it. In a voluntary citizen-police encounter, the citizen is not legally bound to answer the officer's questions. None of the officers testified that Defendant ever expressly disclaimed ownership of the bag, and his conduct could not permit any inference of such intent because he was stopped and detained. Defendant could neither leave the station (and abandon the bag) nor return to claim his bag because he was handcuffed and removed from the public area. Indeed, only a few moments passed between when Defendant set the bag down, shortly after the officers approached him, and when he was detained. Defendant thus had no meaningful opportunity either by word or deed to disclaim or reassert his intent to possess the bag. Under the circumstances presented here, the Government has not demonstrated that Defendant abandoned his bag.

## 2. Whether the Search-Incident-to-Arrest Exception Applies

In addition to abandonment, the Government contends that the officers were justified in searching Defendant's bag without a warrant based on the search-incident-to-arrest exception. The Fourth

Amendment "permits warrantless searches incident to custodial arrests." *United States v. Edwards*, 415 U.S. 800, 802 (1974). The search-incident-to-arrest doctrine "has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained." *Id.* at 802–03. As detailed below, the Court concludes that the search-incident-to-arrest exception is not applicable to the warrantless search here.

### a. Foundation of the Search-Incident-to-Arrest Doctrine

In *Chimel v. California*, 395 U.S. 752 (1969), the Supreme Court clarified and defined the scope of the search incident to arrest exception. Chimel was arrested at his home on a valid arrest warrant. After arresting Chimel, police officers searched his entire home without a search warrant. *Id.* at 754. The *Chimel* Court held that such a sweeping warrantless search exceeded the bounds of the search-incident-to-arrest exception to the warrant requirement. The Court explained that there is "no constitutional justification, in the absence of a search warrant" to extend a search incident to arrest "beyond the [defendant's] person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him." *Id.* at 768.

Twelve years later, in *New York v. Belton*, the Court applied *Chimel* to the context of automobile searches that occur incident to the arrest of a passenger. In *Belton*, the officer arrested the defendant, a vehicle

passenger, after stopping the driver for speeding and smelling marijuana when he approached the car. 453 U.S. 454, 455–56 (1981). The *Belton* Court summarized *Chimel* as holding that "a lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the immediately surrounding area." *Id.* at 457. The validity of such searches, the Court explained, was based on the need "'to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape' and the need to prevent the concealment or destruction of evidence." *Id.* (alteration in original) (quoting *Chimel*, 395 U.S. at 763). The Court further recognized *Chimel*'s emphasis on limiting the scope of a search incident to arrest to the circumstances that triggered the arrest. *Id.*

Applying these principles to the arrest of an automobile passenger, the *Belton* Court held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* at 460 (footnotes omitted). Moreover, the *Belton* Court concluded that such a search also permits the officers to "examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach." *Id.*

The Sixth Circuit, "like the majority of other circuits, interpreted *Belton* to allow law enforcement officers to search [the passenger

27

compartment of] a vehicle incident to a lawful custodial arrest of its occupants without a warrant or probable cause, 'even after the arrestee was handcuffed and placed in the backseat of a police cruiser.'" *United States v. Buford*, 632 F.3d 264, 269 (6th Cir. 2011) (quoting *United States v. Patterson*, 993 F.2d 121, 123 (6th Cir. 1993)). Specifically, the Sixth Circuit read *Belton* to permit searches of areas and objects that *were* in the arrestee's control at the time of arrest, even if the arrestee no longer had control *at the time of the search. Id.*

But in *Arizona v. Gant*, 556 U.S. 332 (2009), the Supreme Court narrowed the scope of *Belton*. Recognizing that the broad reading of *Belton* "has been widely taught in police academies and . . . law enforcement officers have relied on the rule in conducting vehicle searches during the past 28 years," the *Gant* Court nevertheless concluded that "many of these searches were not justified by the reasons underlying the *Chimel* exception." *Id.* at 349. Because "blind adherence to *Belton*'s faulty assumption" that an arrestee can always access the passenger compartment of a vehicle "would authorize myriad unconstitutional searches," the Court clarified the appropriate scope of a search incident to arrest. *Id.* at 350–51. Noting that "the [search incident to arrest] exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations," the *Gant* Court rejected the broad reading of *Belton. Id.* at 338. Instead, the Court held "that the *Chimel* rationale authorizes police to search a vehicle

28

incident to arrest only when the arrestee is unsecured and with reaching distance of the passenger compartment at the time of the search." *Id*. at 343.

The *Gant* Court went on to reach a second holding as well. The Court also held that officers may search a vehicle after a recent occupant is arrested if the officers have reasonable suspicion that evidence relating to the crime of arrest may be found in the vehicle. *Id*. at 351. Thus, the *Gant* Court held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id*.

### b. Recent Search-Incident-to-Arrest Case Law

In its supplemental reply brief, the Government argues that *Chimel* does not dictate the scope of a search incident to arrest in this case. ECF No. 40, PageID.283. Rather, the Government relies upon the Sixth Circuit's decision in *Northrop v. Trippett*, 265 F.3d 372 (6th Cir. 2001). But the problem with *Northrup* is that it was decided before *Gant* and it relies on the broad reading of *Belton* rejected in *Gant*. Specifically, in *Northrop*, the court concluded that "the right to search an item incident to arrest exists even if that item is no longer accessible to the defendant at the time of the search." 265 F.3d at 379.

But this view fails to consider the impact of *Gant*'s limitations on the scope of a search incident to arrest. As other cases have recognized,

the holding in *Northrop* is no longer controlling. *See, e.g.*, *United States v. Mincy*, No. 20-00061, 2022 WL 17176398, at *4 (S.D. Ohio Nov. 23, 2022). As explained in *Mincy*, *Gant* "narrowed" *Northrop*'s interpretation of search incident to arrest, and explicitly limited such searches to the unsecured arrestee's "reaching distance." *Id.* at *4–5.

Indeed, ten years after *Northrop*, the Sixth Circuit confirmed that *Gant* required a change from its previous decisions regarding the scope of search incident to arrest. In *United States v. Buford*, the Sixth Circuit highlighted that before *Gant*, courts in this circuit upheld searches of areas and objects outside of the arrestee's control at the time of the search incident to arrest. 632 F.3d at 269. But "[t]his changed when the Supreme Court decided *Gant* on April 21, 2009." *Id.* As the *Buford* court summarized, the Supreme Court in *Gant* clarified that "the search of a vehicle incident to the arrest of a recent occupant is justified only if the arrestee was unrestrained and within reaching distance of the passenger compartment at the time of the search." *Id.* Importantly, the *Gant* Court also "rejected" the Sixth Circuit's prior interpretations that "the *Chimel* rationale" permitted "searches beyond the arrestee's reaching distance." *Id.*

As noted above, *Gant* authorized two types of searches incident to arrest involving vehicle passengers. First, a search incident to arrest may occur where the unrestrained arrestee is "within reaching distance of the passenger compartment at the time of the search." *Gant*, 556 U.S. at 351.

Second, regardless of whether the arrestee is within reaching distance, a warrantless search of the passenger compartment is permissible if a passenger is arrested and the officers have reasonable suspicion that "the vehicle contains evidence of the offense of arrest." *Id.*

Though *Gant* arose in the context of a vehicle search, it applied the rule and reasoning set out in *Chimel*, which defined the proper scope of a search incident to arrest occurring in a home. This Court's research has not discovered any Sixth Circuit decisions that explicitly apply *Gant* to circumstances involving searches outside of the vehicle context. This may not be surprising, as the second basis for a search incident to arrest authorized by *Gant* is when the officers have reasonable suspicion that "the vehicle contains evidence of the offense of arrest." That basis "is grounded in 'circumstances unique to the vehicle context,' and thus would appear to have no application whatsoever in [a search incident to arrest of a] container" outside of an automobile search. Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 5.5(a) (6th ed. 2022) (quoting *Gant*, 556 U.S. at 335).

But with respect to the first basis for search incident to arrest, authorizing searches of objects and areas where the arrestee is "unsecured" and within "reaching distance" at the time of the search, the *Gant* Court rooted the permissibility and limitations of this search in *Chimel*—a case that did not involve a vehicle search. *Gant*, 556 U.S. at 343.

While the Sixth Circuit has not yet considered the issue, four other federal courts of appeal have held that *Gant*'s "reaching distance" limitation on searches incident to arrest applies outside of the automobile search context. The Third, Fourth, Ninth, and Tenth Circuits have concluded that "although *Gant* specifically addressed the search of an automobile, its principles apply more broadly." *United States v. Knapp*, 917 F.3d 1161, 1168 (10th Cir. 2019); *accord. United States v. Shakir*, 616 F.3d 315, 318 (3d Cir. 2010) ("Because *Gant* foreclosed such a relaxed reading of *Belton*, there is no plausible reason why it should be held to do so only with respect to automobile searches, rather than in any situation where the item searched is removed from the suspect's control between the time of the arrest and the time of the search."); *United States v. Davis*, 997 F.3d 191, 193 (4th Cir. 2021) ("The issue we confront in this appeal is whether the Supreme Court's holding in *Gant* applies beyond the automobile context to the search of a backpack. We join several sister circuits in answering, yes."); *United States v. Cook*, 808 F.3d 1195, 1199 n.1 (9th Cir. 2015); ("We do not read *Gant*'s holding as limited only to automobile searches because the Court tethered its rationale to the concerns articulated in *Chimel*, which involved a search of an arrestee's home."). And in *Smith v. Ohio*, a Supreme Court case pre-dating *Gant* that involved a warrantless search of an arrestee in a parking lot, the Court made clear that "[t]he exception for searches incident to arrest

permits the police to search a lawfully arrested person and areas within his immediate control." 494 U.S. 541, 543 (1990).

The *Gant* decision cannot be reasonably construed as limited to vehicle searches, and its principles must therefore be applied in determining whether the search of Defendant's bag can be justified under the search-incident-to-arrest exception to the warrant requirement. In particular, *Gant* requires the Court to assess whether Defendant's bag was within his immediate control and whether he could have accessed it at the time of the search.

Here, Defendant's bag was nowhere near his immediate control at the time he was arrested nor when the bag was searched. Defendant left his bag in the bus loading area from the moment he was approached by the officers. By the time he was temporarily detained, and then arrested, he had been moved to the nonpublic area and long separated from his bag. At that point, the officers had independently retrieved Defendant's bag and taken full control of it. There was no chance that Defendant could access the bag either to retrieve a weapon or destroy evidence. Under these facts, the Government cannot rely on the search incident to arrest exception to justify the warrantless search. *See United States v. Grant*, 920 F.2d 376, 389 (6th Cir. 1990) ("Because [the defendant] had been arrested and there was no danger that the evidence would be lost or destroyed, there was no justification for the officers' failure to obtain a search warrant prior to searching the luggage."); *Davis*, 997 F.3d at 198,

33

202 (holding that a search of the defendant's backpack did not comply with *Gant* where the defendant was handcuffed, "not within reaching distance of his backpack," and "outnumbered" by the officers who were focused on keeping him secured).

"[A] passenger on a common carrier has a reasonable expectation that the contents of his luggage will not be exposed absent consent or a search warrant." *United States v. Guzman*, 75 F.3d 1090, 1095 (6th Cir. 1996). Although the dog sniff of Defendant's bag gave the officers probable cause to believe the bag was likely to contain drugs, probable cause is the prerequisite to obtaining a search warrant—it did not provide unfettered authority to conduct a search. *Place*, 462 U.S. at 701 ("Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents.").

Other cases arising in the context of bus station or airport seizures confirm that (in the absence of consent or some other valid exception) a dog alert provides probable cause to get a warrant—not to open and search the bag. *See, e.g.*, *Guzman*, 75 F.3d at 1092 (summarizing that officers seized the defendant's bag after positive alert from dog sniff and obtained a search warrant before opening the bag); *United States v. Lewis*, 708 F.2d 1078, 1079 (6th Cir. 1983) (same); *United States v. Ward*, 144 F.3d 1024, 1027 (7th Cir. 1998) (same); *United States v. McFarley*,

991 F.2d 1188, 1191 (4th Cir. 1993) (same). In this case, the Government has failed to meet its burden to show that an exception to the warrant requirement applies to the search of Defendant's bag. Consequently, the warrantless search violated the Fourth Amendment, and evidence seized from the bag must be suppressed.

### C. Suppression of Evidence Found in Defendant's Bag and Defendant's Statements Made During Custodial Interrogation

Under the exclusionary rule, "evidence seized during an unlawful search [cannot] constitute proof against the victim of the search." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). Exclusion applies to "indirect" and "direct" products of the illegal search. *Id.* In addition, the defendant's statements or a confession must be excluded if derived from an illegal search or seizure. *Taylor v. Alabama*, 457 U.S. 687, 689–90 (1982). But the Government can defeat exclusion of a voluntary statement obtained after an illegal search by arguing that the temporal proximity between the illegal search and the statement, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct favor admitting the subsequent statements. *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975); *see also United States v. Elmore*, 18 F.4th 193, 199 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 2666 (2022) ("But in keeping with the deterrence rationale for the exclusionary rule, derivative evidence will not be suppressed where the causal connection

between challenged evidence and the constitutional violation is remote or attenuated.").

Because the officers violated Defendant's Fourth Amendment rights by searching his bag without a warrant, the drugs found in Defendant's bag must be suppressed. The Government makes no attempt to argue—nor can it—that the attenuation doctrine supports admission of Defendant's custodial interrogation statements. As the record demonstrates, Defendant was quickly transported to and questioned at the MSP Detachment after the officers searched Defendant's bag. No intervening circumstances dissipated the taint from the illegal search. Accordingly, Defendant's custodial interrogation statements are also inadmissible.

## IV. CONCLUSION

Defendant has met his burden to show that the officers violated his Fourth Amendment rights. Therefore, suppression of the evidence in the form of the drugs found in Defendant's bag and Defendant's statements made during custodial interrogation is warranted. Defendant's motion to suppress evidence is **GRANTED**.

The Court sets this matter for trial[2] to commence on June 27, 2023.

---

[2] The Court is cognizant that more than 30 days have elapsed between the time when this matter was fully briefed, February 17, 2023, and today's decision. Although neither party has raised any concerns regarding the Speedy Trial Act, that statute provides pursuant to 18 U.S.C. § 3161(h)(1)(D), that 30 days are excludable for the Court's

**IT IS SO ORDERED.**

Dated: May 30, 2023          s/Terrence G. Berg
                             TERRENCE G. BERG
                             UNITED STATES DISTRICT JUDGE

---

consideration of a motion after supplemental briefing is complete. After that, for the period between March 19, 2023 and the new trial date set out in this Order, the Court finds that the ends of justice served by this delay outweigh Defendant's and the public's interest in a speedy trial due to the complexity of the legal and factual questions raised in Defendant's motion to suppress. 18 U.S.C. § 3161(h)(7)(A). The necessity of spending sufficient time thoroughly evaluating these issues and reaching a correct legal conclusion clearly served the interests of justice. 18 U.S.C. § 3161(h)(7)(B)(i)–(iv). Accordingly, the Court finds that the time period between March 19, 2023 and the new trial date set out in this Order constitutes excludable delay.